# 26-1021-cv

## United States Court of Appeals

### *for the*

## Second Circuit

———————◆———————

CHARLES DOHERTY, individually and as representatives on behalf of a class of similarly situated persons, MICHAEL J. NOEL, individually and as a representative on behalf of a class of similarly situated persons,

*Plaintiffs-Appellees*,

– v. –

BRISTOL-MYERS SQUIBB COMPANY, BRISTOL-MYERS SQUIBB COMPANY PENSION COMMITTEE, STATE STREET GLOBAL ADVISORS TRUST COMPANY, BRISTOL-MYERS SQUIBB COMPENSATION AND MANAGEMENT DEVELOPMENT COMMITTEE,

*Defendants-Appellants,*

JOHN DOE 1-10,

*Defendant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICUS CURIAE* AMERICAN COUNCIL OF LIFE INSURERS IN SUPPORT OF DEFENDANTS-APPELLANTS

MARK E. SCHMIDTKE
OGLETREE DEAKINS
56 South Washington Street, Suite 302
Valparaiso, Indiana 46383
(219) 242-8666

KRISTINA N. HOLMSTROM
OGLETREE DEAKINS
2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016
(602) 778-3700

*Counsel for Amicus Curiae*

COUNSEL PRESS
A ᐅ Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (394904)

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, *Amicus Curiae* American Council of Life Insurers makes the following disclosure:

1.  Is party/amicus a publicly held corporation or other publicly held entity?

    No.

2.  Does party/amicus have any parent corporations?

    No.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

    No.

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

    No.

5.  Is party a trade association?

    No.

6.  Does this case arise out of a bankruptcy proceeding?

    No.

7.  Is this a criminal case in which there was an organizational victim?

    No.

i

# TABLE OF CONTENTS

INTEREST of AMICUS CURIAE ............................................................1

ARGUMENT .......................................................................................1

   I.   INTRODUCTION ....................................................................1

   II.   LIFE INSURERS ARE SUBJECT TO ROBUST AND RELIABLE SOLVENCY REGULATION. .........................................4

      A.  Reserving And Capital Requirements Protect Consumers From Insurer Insolvencies. .........................................6

      B.  Financial Regulation And Consumer Protection Standards Are Continually Evolving To Protect Consumers. ...........9

      C.  Regulators Have A Wide Array Of Tools To Oversee The Legal Entity And Insurance Group To Protect Contract Holders And Policyholders From Losses. ...............10

      D.  State Regulators Coordinate A Broad Range Of Risk Based Financial Surveillance Tools To Promote The Safety And Soundness Of Insurers. .........................13

      E.  Reinsurance Is A Component Of The Insurance Ecosystem But Does Not Eliminate Or Decrease An Annuity Issuer's Obligation To Certificate Holders. .........................14

      F.  Regulatory Intervention, Rehabilitation and Receivership Work Together To Protect Consumers. .........................15

   III.  STATE GUARANTY ASSOCIATIONS SUPPORT THE CONTINUATION OF BENEFITS. ...........................18

CONCLUSION ....................................................................................19

CERTIFICATE OF COMPLIANCE ........................................................22

CERTIFICATE OF SERVICE ...............................................................23

ii

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Aetna Health Inc. v. Davila*,
542 U.S. 200 (2004)..............................................................................2

*Conkright v. Frommert*,
559 U.S. 506 (2010)..............................................................................2

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022)..............................................................................4

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996)..............................................................................2

*Mack Boring and Parts v. Meeker, Sharkey Moffitt*,
930 F.2d 267 (3d Cir. 1991) .................................................................3

**Statutes**

29 U.S.C. § 1341(b)(3)..............................................................................2

Employee Retirement Income Security Act of 1974, 29 U.S.C. §
1001, et seq. .....................................................................................1, 2

**Other Authorities**

Affirmation of Jocelyn A. Merced, Consumer Protection Comparison.
https://www.nber.org/system/files/working_papers/w6001/w6001.
pdf ........................................................................................................3

Annual Report,
https://www.pbgc.gov/sites/default/files/documents/pbgc-annual-
report-2025.pdf ....................................................................................6

Center for Insurance Policy Research, *Own Risk and Solvency
Assessment (ORSA) (naic.org)/* .........................................................11

De-risking Strategies of Defined Benefit Plans: Empirical Evidence
from the United States, Soc'y of Actuaries 11 (Nov. 2020),
https://www.soa.org/globalassets/assets/files/resources/research-
report/2020/de-risking-strategies.pdf...................................................2

https://content.naic.org/cipr-topics/risk-based-capital ................................................ 9

https://content.naic.org/sites/default/files/model-law-312.pdf .............................. 15

https://content.naic.org/sites/default/files/model-law-555.pdf;
https://content.naic.org/sites/default/files/model-law-state-page-
555.pdf ................................................................................................................. 18

https://content.naic.org/sites/default/files/model-law-state-page-
505.pdf ................................................................................................................. 15

NAIC Actuarial Opinion Memorandum Regulation ................................................. 8

NAIC Center for Insurance and Policy Research, *Macroprudential
Supervision (naic.org)* (2023) ............................................................................ 9

NAIC Center for Insurance and Policy Research, *Macroprudential
Supervision (naic.org)* (2023) .......................................................................... 10

NAIC, *Enterprise Risk Report ("Form F") Implementation Guide
(2018)*, *available at*
committees_e_isftf_group_solvency_related_form_f_guide_0.pdf
(naic.org) ............................................................................................................ 11

*NAIC Group Capital Calculation 2022 Instructions*, *available at*
https://content.naic.org/sites/default/files/inline-
files/12312022%20GCC%20Instructions_revised.pdf .................................... 12

*NAIC Liquidity Stress Testing Framework* (2022) .................................................. 10

NAIC List of MWG Considerations - PE Related and Other (naic.org)
(2022) .................................................................................................................. 10

NAIC, *NAIC Issue Brief: Solvency Modernization Initiative* (2009) ...................... 9

NAIC, *Reinsurance Comparison Worksheet* (2023) ............................................... 10

NAIC Standard Valuation Model Law .................................................................... 8

NAIC, *State Insurance Regulation* (2021) *available at*
https://content.naic.org/sites/default/files/inline-
files/topics_white_paper_hist_ins_reg.pdf ......................................................... 4

NAIC, *Technology and Products Services* (2019) .................................................. 13

NAIC Technology Products and Services, (2019)......................................................13

NAIC, *The U.S. National State Based System of Insurance Regulation
and the Solvency Modernization Initiative* (2013) ...............................................13

PBGC's Single-Employer Guarantee Outcomes,
PBGC 5-6, 10-12 (May 2019),
https://www.pbgc.gov/sites/default/files/2016-single-employer-
guaranty-study.pdf ..................................................................................................6

## INTEREST of AMICUS CURIAE

The American Council of Life Insurers (ACLI) is the leading trade association driving public policy and advocacy on behalf of the life insurance industry. Ninety million American families rely on the life insurance industry for financial protection and retirement security. ACLI's member companies are dedicated to protecting consumers' financial wellbeing through life insurance, annuities, retirement plans, long-term care insurance, disability income insurance, reinsurance, and dental, vision and other supplemental benefits. ACLI's 275 member companies represent 94 percent of industry assets in the United States.

The parties have consented to ACLI filing this *amicus curiae* brief.  Fed. R. App. Proc. 29(a)(1).

## ARGUMENT[1]

## I.     INTRODUCTION.

Employee benefits are voluntary. Although the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et. seq*. ("ERISA") regulates private employee benefit programs, it does not require employers to offer

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(4)(E) and Rule 29.1 CTA2, ACLI states that (a) a party's counsel did not author this brief in whole or in part; (b) neither a party nor a party's counsel contributed money to fund preparation or submission of this brief; and (c) no person other than ACLI and its members contributed money to fund preparing or submission of this brief.

1

pension benefits: "Nothing in ERISA requires employers to establish employee benefits plans." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). ERISA is a "careful balancing" between ensuring employees receive their benefits and encouraging employers to create benefit plans in the first place. *See Conkright v. Frommert*, 559 U.S. 506, 517 (2010); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004).

Pension risk transfers are an integral component of maintaining pension benefits and have occurred for decades.[2] Through them, a sponsor can transfer its pension obligations and assets to an insurer using a bulk annuity contract.[3] This ensures a participant will receive a monthly retirement benefit (the terms of which are reflected in the annuity contract). Insurers are thus critical to the process and well-suited for the role. Insurance products have served as one of the primary vehicles for funding pension plans since the early 1920s, and annuity contracts were among the first widely used investments for funding pension plan

---

[2] In some cases, ERISA expressly requires certain pension risk transfers. *See* 29 U.S.C. § 1341(b)(3) (irrevocable insurance commitments required in standard plan termination).

[3] *See* De-risking Strategies of Defined Benefit Plans: Empirical Evidence from the United States, Soc'y of Actuaries 11 (Nov. 2020), https://www.soa.org/globalassets/assets/files/resources/research-report/2020/de-risking-strategies.pdf.

obligations.[4] Life insurers are the experts at managing long-term risk, and corporations are increasingly turning to life insurers to lessen the risks on their own balance sheets. By the late 1980s, it was estimated that more than half a trillion dollars in pension benefits, covering over 54 million people, were provided under insurance contracts.[5] It's no surprise. ***The U.S. life insurance industry has been managing long-term risk for more than 175 years, through all types of economic conditions, including wars, recessions, and pandemics. After COVID-19, life insurers paid out more than $370 billion in death benefits between 2020-23.***

Insurance contracts and annuities allow plans to meet their benefit commitments while eliminating volatility from pension costs (caused by unexpected mortality experience, investment earnings, changes in interest rates, and expenses of administration). The insurer unconditionally guarantees payment of each participant's benefit as provided by the plan.[6] The insurer, rather than the plan sponsor, carries the risk that actual costs will be greater than anticipated. A

---

[4] *See* Dkt. 79-2, at 8, Exhibit A to Affirmation of Jocelyn A. Merced, Consumer Protection Comparison.
https://www.nber.org/system/files/working_papers/w6001/w6001.pdf, at 17.
[5] *See* ACLI 1989 Life Insurance Fact Book Update at 25 (1989) (estimating that, as of 1989, life insurance companies held $569 billion under contracts with pension plans).
[6] D. McGill and D. Grubbs, Fundamentals of Private Pensions at 526–27 (6th ed. 1989); *Mack Boring and Parts v. Meeker, Sharkey Moffitt*, 930 F.2d 267, 269 (3d Cir. 1991).

3

pension risk transfer is one of the few ways an employer can act to obtain certainty over future pension expenses.

There are extensive and consistent protections in place after a plan sponsor decides to transfer risk in providing ongoing pension benefits to participants. In this brief, ACLI provides the Court with context[7] outlining the various levels of monitoring, regulation, and intervention that ensure participants are protected in the event of a pension risk transfer.

## II.  LIFE INSURERS ARE SUBJECT TO ROBUST AND RELIABLE SOLVENCY REGULATION.

Across the United States, life/annuity insurance companies are subject to robust and extensive state regulation and regulatory oversight to ensure that insurers can fulfill their long-term promises to customers.[8] The financial regulation of U.S. life/annuity insurers is remarkably consistent in all 50 states and the District of Columbia. Insurer solvency regulation in every state must meet or exceed the strong baseline requirements described in model laws and regulations developed by the National Association of Insurance Commissioners ("NAIC"). Much of the consistency is due to all 50 states and the District of Columbia

---

[7]  When considering a motion to dismiss fiduciary duty claim, court must conduct a "context-specific inquiry." *Hughes v. Nw. Univ.*, 595 U.S. 170, 173 (2022).

[8] NAIC, *State Insurance Regulation* (2021) *available at* https://content.naic.org/sites/default/files/inline-files/topics_white_paper_hist_ins_reg.pdf.

receiving NAIC accreditation. Moreover, the state-based system is not static—state regulators continue to regularly review and update financial and consumer protection requirements for annuity providers.

Baseline standards and oversight include requirements regarding the establishment and adequacy of reserves,[9] valuation of assets and liabilities, risk-based capital ("RBC") requirements, surplus rules, enterprise risk management, assessments of group capital, presale approval of insurance contracts (with actuarial justification), and restrictions on issuing dividends to holding companies.

Due to existing regulatory requirements and protections, annuity issuers rarely fail, and when they do, they still have substantial assets. By contrast, there is no comparable prudential regulation of defined benefit plans, and when these plans fail, shortfalls of material amounts are common. Pension plans have far higher failure rates than insurers. In 2025 alone, the PBGC, which assumes the role of trustee for single-employer pension plans when a plan terminates and lacks the resources to pay benefits, trusteed 31 plans covering approximately 20,000 current

---

[9] Reserves are funds that the insurer sets aside to pay claims when they become due. There are detailed rules (e.g., Valuation Manuals, Actuarial Guidelines, model laws and regulations) that determine how an insurer calculates its reserves. *See* Life and Annuity Reserve Standards Model Regulation (#820), Valuation Manual ("VM") 20 and 21.

and future retirees.[10] And in separate research, the PBGC studied 500 plans that had gone insolvent between 1998 and 2012. Of those 500 plans, 187,000 participants received benefits cuts averaging $45,000. In aggregate that was $8.5 billion, with an average reduction of 24 percent of the pension.[11]

Annuities protect retiree benefits when an employer decides to transfer the long-term risks associated with defined benefit plans (e.g., risks in interest rate, inflation, asset, longevity). Life/annuity insurers continue to play a vital role in providing for Americans' long-term financial security through the provision of annuities, including those purchased by employers in a pension risk transfer arrangement. Below are examples of the tools and prudential regulations to ensure that a life/annuity insurer can fulfill its long-term promises to American families and retirees.

### A. Reserving And Capital Requirements Protect Consumers From Insurer Insolvencies.

Like other sophisticated regulatory systems, the U.S. insurance regulatory system uses an RBC system to determine the minimum amount of capital an

---

[10] *See* PBGC 2025 Annual Report, https://www.pbgc.gov/sites/default/files/documents/pbgc-annual-report-2025.pdf.

[11] PBGC's Single-Employer Guarantee Outcomes, PBGC 5-6, 10-12 (May 2019), https://www.pbgc.gov/sites/default/files/2016-single-employer-guaranty-study.pdf ("PBGC Study").

6

insurer must hold. Unlike other financial institutions, life insurers must maintain reserves for *every* policy or certificate issued, as well as aggregate reserves to support the overall company solvency, plus additional capital. Since the implementation of the enhanced reserving and solvency rules in the mid-1990s, ***ACLI is not aware of any retirement plan participants whose employer entered into a pension risk transfer having benefits reduced due to the selected insurer's insolvency***.

   1. <u>RBC Ensures Insurers Remain Solvent.</u>

RBC sets a statutory minimum level of capital based on an insurance company's size and the level of risk associated with the insurer's financial assets and operations. Under RBC, an insurers' minimum capital requirements are proportional to its risk. RBC assesses a variety of risks, including the credit risk of fixed income investments and the risk of fair-value losses from equity (and similar) investments. Other risks included in the RBC formula include asset risk, insurance/underwriting risk, interest rate risk, and business risk, and it differentiates between insurance industry sectors (life, property and casualty, and health).

RBC is calculated using Statutory Accounting Principles ("SAP"). Life/annuity insurers must calculate and hold reserves using moderately adverse conditions for their outstanding liabilities, including their promises to certificate

holders. This approach limits the ability for companies to use overly optimistic assumptions around asset performance and key liability assumptions such as mortality (e.g., for annuities, that the assumed mortality is not too high).

While RBC is not the only tool used to evaluate financial solvency, the RBC system includes thresholds that trigger regulatory intervention to ensure policyholders will receive the benefits promised without relying on a guaranty association or taxpayer funds.

> 2.      <u>Asset-Adequacy Testing Requires Companies To Test The Adequacy Of Assets To Fulfill Obligations.</u>

In addition to certificate level reserves, the insurer's appointed actuary must annually certify the adequacy of current assets to support future obligations of the company.[12] Such asset adequacy testing ("AAT"), often in the form of cash flow testing, reflects moderately adverse conditions. The sufficiency of the assets is evaluated against a variety of economic scenarios, including interest rate risk.

Over the past 30-plus years, RBC and asset adequacy testing has been (and continues to be) repeatedly reviewed and refined, reflecting changing conditions

---

[12] NAIC Actuarial Opinion Memorandum Regulation (#822) (requiring asset-adequacy analysis); NAIC Standard Valuation Model Law (#820) (setting standards for the calculation of reserves, actuarial opinions and cash flow testing used in asset adequacy analysis requirements); NAIC Valuation Manual (including standards and actuarial guidance). All 50 states and the District of Columbia have adopted these materials.

and increasing sophistication of modeling techniques. *See*

https://content.naic.org/cipr-topics/risk-based-capital.

**B.** **Financial Regulation And Consumer Protection Standards Are Continually Evolving To Protect Consumers.**

The primary reason that insurers fared so well during the financial crisis is because of the effective financial solvency regulation and the robust nature of the insurance industry. The regulation of annuity insurers is comprehensive, cradle to grave, and very effective. Further, none of the NAIC standards or requirements are static–the regulatory system is constantly evolving to adapt to marketplace developments. Reserves, AAT, RBC, and other parts of the solvency framework were significantly enhanced in the mid-1990s and are subject to continual review and enhancement. Recent examples of this examination and refinement include:

- NAIC's Solvency Modernization Initiative ("SMI"). The NAIC launched the SMI after the financial crisis in 2008.[13] The SMI was a critical evaluation of the U.S.'s insurance group supervisory framework that resulted in significant enhancements to insurance group supervision in the states. It included a review of international developments regarding insurance, banking, and international accounting standards and their potential use in U.S. insurance regulation. The SMI enhanced regulatory requirements in five key solvency areas: (1) capital requirements; (2) international accounting; (3) insurance valuation; (4) reinsurance; and (5) group regulatory issues.

- NAIC Macroprudential Initiative (2017) ("MPI").[14] The MPI was designed to identify potential regulatory enhancements in four areas, including (1)

---

[13] NAIC, *NAIC Issue Brief: Solvency Modernization Initiative* (2009).

[14] NAIC Center for Insurance and Policy Research, *Macroprudential Supervision (naic.org)* (2023).

liquidity risk, (2) capital stress testing, (3) recovery and resolution, and (4) counterparty exposure and concentration. The MPI led to enhanced reporting of liquidity risks in the Annual Statements, as well as the creation of Liquidity Stress Testing Framework for large life insurance groups.[15]

- NAIC Regulatory Considerations Applicable (but not exclusive to) Private Equity Owned Insurers (2022-2023).[16] The Regulatory Considerations Project resulted from regulators' focus on insurance company activities because of the increasing complexity of transactions and the evolving insurance marketplace. Despite its original name, regulators expressly recognized that the activities discussed in the "Regulatory Considerations" should not be focused on a particular ownership type or corporate structure. This included a new tool to make it easier for regulators to review the impact of reinsurance transactions.[17]

C.    **Regulators Have A Wide Array Of Tools To Oversee The Legal Entity And Insurance Group To Protect Contract Holders And Policyholders From Losses.**

In addition to the standards and requirements listed above, regulators have an array of tools that are used holistically with RBC, the Group Capital Calculation ("GCC"), and financial exams and surveillance to promote insurer solvency. Examples include preemptive measures requiring notification and pre-approval from regulators and annual disclosures, exams, and assessments. Preemptive measures built into the state insurance regulatory framework are intended to

---

[15] *NAIC Liquidity Stress Testing Framework* (2022).

[16] NAIC Center for Insurance and Policy Research, *Macroprudential Supervision (naic.org)* (2023); NAIC List of MWG Considerations - PE Related and Other (naic.org) (2022).

[17] NAIC, *Reinsurance Comparison Worksheet* (2023).

mitigate risks before they occur. Preemptive measures include requirements that insurers obtain pre-approval for a variety of transactions, such as the approval to issue extraordinary dividends, changes in control, or approval for large reinsurance deals.[18] Transactions between insurers and affiliates – or transactions that benefit affiliates – are subject to special scrutiny.[19] Regulators have a wide degree of latitude to deny or condition an acquisition.

Insurers are also subject to numerous and thorough disclosure requirements. For instance, insurers must disclose information relating to enterprise risks within the holding company system,[20] provide Own Risk Solvency Assessments ("ORSA") giving a wide view of risk and capital,[21] as well as Quarterly and

---

[18] The pre-dividend approval requirement is intended to protect policyholders from inappropriate payments to investors, or other distributions.

[19] Section 5 of the Insurance Holding Company Systems Act (#440) requires pre-approval for transactions between entities within the same insurance holding company system, including investments, management agreements and service contracts, guarantees, sales, loans and extensions of credit that exceed 3% of insurers' surplus; direct or indirect acquisitions, reinsurance pooling agreements; and reinsurance transactions exceeding 5% of the insurers' surplus.

[20] Form F is required under the Insurance Holding Company System Model Act (#440) and the Insurance Holding Company Systems Model Regulation ("Holding Company Regulation") (#450); NAIC, *Enterprise Risk Report ("Form F") Implementation Guide (2018)*, *available at* committees_e_isftf_group_solvency_related_form_f_guide_0.pdf (naic.org)

[21] Risk Management and Own Risk and Solvency Assessment Model Act (#505); Center for Insurance Policy Research, *Own Risk and Solvency Assessment (ORSA) (naic.org)/*.

Annual Financial Statements to State insurance regulators, which could trigger a "ladder of intervention" if the data is concerning.[22]

Moreover, insurers are subject to a number of prudential supervisory tools, including:

- Financial Condition Exams assess the insurer's financial condition, its ability to fulfill obligations, and compliance with state laws and regulations.

- Annual Supervisory Plans are developed for each domestic insurer based on the results of recent financial exams and the quarterly and annual analysis process. The plan describes the supervisory plan for each insurer for the ensuing year. Supervisory plans include financial examiners' recommendations for enhanced oversight (e.g., more frequent statutory exams, additional limited scope exams, key areas for financial analysis monitoring, etc.).

- Group Capital Calculation ("GCC") assessments are conducted annually. The GCC assists regulators in understanding the financial condition of non-insurance entities in the group, how capital is distributed across an entire group, and whether and to what extent an insurer may be supporting the operations of non-insurance entities.[23] The GCC is a baseline quantitative metric that complements the view of group-specific risks in ORSA and Form F, that may not otherwise be disclosed in legal entity filings.[24]

---

[22] Interventions range from additional monitoring and a prompt corrective action plan up to takeover of the insurer. Supervisors may also declare that an insurer is in "Hazardous Financial Condition" and may intervene on the basis of that designation.

[23] *NAIC Group Capital Calculation 2022 Instructions*, 4, *available at* https://content.naic.org/sites/default/files/inline-files/12312022%20GCC%20Instructions_revised.pdf.

[24] *Id.*

- Liquidity Stress Testing requires enhanced disclosure and stress testing of large life insurers to allow regulators to better assess the macroprudential impact of liquidity stress impacting multiple life insurers.[25]

- Supervisory Colleges facilitate the oversight of internationally active insurance companies at the group level. Colleges are joint meetings of interested regulators with company officials and include detailed discussions about financial data, corporate governance, and enterprise risk management functions.

**D.     State Regulators Coordinate A Broad Range Of Risk Based Financial Surveillance Tools To Promote The Safety And Soundness Of Insurers.**

In addition to the robust tools listed above, all 50 states and the District of Columbia contribute to and use financial surveillance and analysis tools. The NAIC offers almost 70 specific tools to assist with the solvency assessment of insurers.[26] Among these tools are FAST, which is a "collection of analytical solvency tools and databases designed to provide state insurance departments with an integrated approach to reviewing the financial condition of insurers" operating in their jurisdictions.[27] FAST helps identify and analyze insurers in greatest need of regulatory attention by assessing a variety of indicators, including leverage, asset quality, liquidity and insurer operations.[28] Also included are Financial Analysis

---

[25] Final 2021 LST Framework (naic.org).

[26] NAIC, *Technology and Products Services* (2019).

[27] Id.

[28] NAIC Technology Products and Services, (2019); NAIC, *The U.S. National State Based System of Insurance Regulation and the Solvency Modernization Initiative* (2013).

13

Working Groups, which are groups of seasoned regulators that meet quarterly to analyze nationally significant insurers and groups that are identified as potentially "trending towards financially troubled." Both groups consult with the insurer's domiciliary and lead-state regulator to discuss, advise and support appropriate regulatory strategies and actions. The groups also promote a multi-state approach to identifying and addressing potential solvency concerns, including industry-wide trends.

Regulators likewise rely on routine financial analysis, financial exams, and other tools. Regulators can use these tools to benchmark companies against peer companies to identify outliers in need of additional surveillance. The results of the information and supervisory analysis ultimately inform and guide the regulators' response to the data.

### E. Reinsurance Is A Component Of The Insurance Ecosystem But Does Not Eliminate Or Decrease An Annuity Issuer's Obligation To Certificate Holders.

Reinsurance is a risk management tool used by life insurers to spread risk and manage capital. With reinsurance, a life/annuity insurer transfers some of its insurance risk to another insurer. In effect, reinsurance is insurance for insurers. By transferring and lessening its risk, a life/annuity insurer is better able to provide financial protection products to a larger array of people and groups.

14

The size and number of insurable risks in the U.S. are substantial and ever-growing, making the availability of reinsurance, including outside the U.S., important for a functioning insurance system. That is why, if certain regulatory conditions are met (including U.S. Credit for Reinsurance and Life and Health Reinsurance Agreements laws and regulations), U.S. insurers can obtain reinsurance domestically and internationally, and why U.S. reinsurers can provide reinsurance in the U.S. and abroad.

It is important to note that an annuity issuer's decision to reinsure an annuity that is part of a pension risk transfer does not relieve the annuity issuer from its obligation to pay certificate holders, regardless of the reinsurer's performance. The annuity issuer selected by the plan fiduciary remains 100% liable for all annuity payments and the use of reinsurance does not change that obligation.

**F.      Regulatory Intervention, Rehabilitation and Receivership Work Together To Protect Consumers.**

All 50 states and the District of Columbia[29] have adopted (1) the RBC Model Act,[30] which provides a ladder of intervention with escalating requirements for states to intervene and take action if an insurer's RBC ratio falls below a specified amount; and (2) the Hazardous Financial Condition Model Regulation, which

---

[29] https://content.naic.org/sites/default/files/model-law-state-page-505.pdf

[30] https://content.naic.org/sites/default/files/model-law-312.pdf

provides regulators with broad authority to determine that continued operation of an insurer is hazardous to policyholders and the public. While the Act enumerates standards to determine whether continued operation is hazardous, it also allows the regulator to deem continued operation hazardous based on "any…finding determined by the commissioner to be hazardous to the insurer's policyholders, creditors or general public." Regulators often intervene before companies even reach the first regulatory level of intervention. The states have broad powers to intervene, implement corrective actions, and take over certain responsibilities of the insurer early on should problems be identified, such as when a company is deemed to be in hazardous financial condition.

There is a well-developed process in each state when an insurer falls below its minimum capital requirements. The "ladder of intervention" contains four levels of mandatory intervention tied to an insurer's RBC ratio and its authorized control level ("ACL") of RBC. ACLs are calculated for each insurer using the RBC formula, taking the insurer's risks and assets into account. The RBC ratio formula is designed to determine ratios that fall between a target of 70% and 300%.[31] If an insurer drops below 300%, it triggers increasing levels of intervention, culminating in Mandatory Control Level if an insurer has total adjusted capital less than 70% of

---

[31] 350% in some states.

its ACL. Notably, an insurer with an RBC of 70% still has sufficient capital to pay its existing liabilities but will not be able to issue new business. The state's receiver would then have the option of trying to rehabilitate or liquidate the insurer.

Regulators are required to intervene and work with a company to implement corrective action plans long before a company becomes impaired or insolvent. Early intervention is intended to prevent the insolvency and liquidation of a company by guarding the assets of the insurer and in many instances, organizing the sale of some, or all, of the insurer's business to a financially stable insurer.

If an insurance company, however, becomes financially unstable, the insurance department in its home state will step in and seek to take control of the company. There are two main types of receiverships. Rehabilitation is an attempt to restore the insurer to a healthier financial position so it can eventually continue normal business operations (some states allow for conservation before a rehabilitation is sought). Liquidation provides for the winding down and termination of an insurer and the marshalling of the estate's assets to pay the claims of policyholders and other creditors.

When a company's financial difficulties are too great to overcome, the insurance department will petition its state's receivership court to declare the company insolvent and move for liquidation. At this stage, the liquidator, usually

17

the insurance commissioner or someone appointed by the commissioner, will attempt to maximize the company's estate assets to pay the claims of policyholders and creditors. The liquidator may also seek to have one or more financially sound insurance companies take over or assume some or all of the insolvent insurer's "book of business" and associated policyholder obligations.

Policyholders, as well as certificate holders under group contracts, are given "super priority" status over general creditors and many otherwise protected parties (i.e., employee claims). Few, if any, claims are superior to policyholder claims (*i.e.*, the state's administrative costs, guaranty association costs). Life insurers' creditors seldom have extensive security interests, so policyholders' claims often have access to most of the insurer's general assets.

## III. STATE GUARANTY ASSOCIATIONS SUPPORT THE CONTINUATION OF BENEFITS.

State insurance guaranty fund associations provide a further safety net or "floor" of protection for policyholders.[32] When a participant's or class of participants' pension obligation is annuitized, the liability for payment of annuitized benefits is legally transferred from the plan to an insurer, which (as outlined above) is subject to stringent solvency standards and ongoing oversight by state insurance regulators. Beyond that, all states have a life and health insurance

---

[32] *See* generally https://content.naic.org/sites/default/files/model-law-555.pdf; https://content.naic.org/sites/default/files/model-law-state-page-555.pdf.

guaranty association established to provide certain statutory benefits to policyholders in the unlikely event of an insurer failure. Each state guaranty association will provide up to the state's statutory amount of coverage to its resident policyholders, including those for annuity obligations. State coverage limits range from $100,000 to $500,000 of *the contract's present valu*e, though most states provide at least $250,000 of coverage. A contract's present value is the current value of the stream of payments.

In the case of a pension risk transfer, a certificate holder under a group annuity contract is treated as a separate contract for the purposes of guaranty association protections. In an insolvency, plan participants with total payment streams valued at or below the state guaranty association's coverage limit would be fully covered. Claims exceeding those limits are paid to the extent there are any remaining estate assets.

While the state guaranty associations are an important piece of the annuity payment protection system, the primary protection is the strong regulation of the life insurance industry which includes stringent capital and reserve requirements.

## **CONCLUSION**

The life insurance industry is subject to robust and extensive regulation and oversight by the states to ensure that life insurers can fulfill their long-term promises to customers. These rules have been established and standardized across

the states. They are actively monitored and enforced by the states to ensure that insurers have assets that exceed the commitments they have made to ensure that annuitants receive the income they have been promised for as long as promised. There remains little to no risk to participants under a pension risk transfer. It is important that the Court recognize the highly speculative nature of Appellees' claimed harm to protect the plans and participants from costly, protracted—and ultimately meritless—litigation.

ACLI urges the Court to overturn the decision below.

Respectfully submitted this 21st day of July, 2026.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.


By:    */s/ Kristina N. Holmstrom*
Mark E. Schmidtke
56 S. Washington Street, Suite 302
Valparaiso, IN 46383
Telephone: (219) 242-8668
Facsimile: (219) 242-8669
mark.schmidtke@ogletree.com

-and

Kristina N. Holmstrom
2415 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: (602) 778-3724
Facsimile: (602) 778-3750
kristina.holmstrom@ogletree.com

*Counsel for Amicus Curiae*
*American Council of Life Insurers*

21

## <u>CERTIFICATE OF COMPLIANCE</u>

This Brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29 (a)(5) and 32(a)(7)(B) and Second Circuit Rules 29.1(c) and 32.1(a)(4) because it contains 4,226 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: July 21, 2026          */s/ Kristina N. Holmstrom*
                                       Kristina N. Holmstrom

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2026, I electronically filed with the Clerk of the Court the foregoing AMERICAN COUNCIL OF LIFE INSURERS' *AMICUS CURIAE* BRIEF via the Court's CM/ECF system, which will serve a copy of same on all counsel of record in this matter through operation of the CM/ECF system.

Dated: July 21, 2026                     */s/ Kristina N. Holmstrom*
                                              Kristina N. Holmstrom

23